[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 30, 2009
THOMAS K. KAHN
CLERK

No. 06-15143

_____

D. C. Docket No. 05-20596-CR-MGC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTONIO SANCHEZ,
EDUARDO HERNANDEZ,
LAZARO CAMEJO,
a.k.a. Luis Camejo,
MIGUEL ANGEL SANCHEZ,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(October 30, 2009)

Before TJOFLAT and BLACK, Circuit Judges, and RESTANI,* Judge.

---

* Honorable Jane A. Restani, Chief Judge for the United States Court of International
Trade, sitting by designation.

TJOFLAT, Circuit Judge:

Before us are the appeals of four criminal defendants—Miguel Sanchez, Antonio Sanchez, Eduardo Hernandez, and Lazaro Camejo.[1] They and two other individuals, Noel Gasca and Kenya Azcuy, were caught burglarizing, or attempting to burglarize, South Florida houses used for growing hydroponic marijuana. Hydroponic marijuana, as contrasted to regular marijuana, is extremely potent; hydroponic plants tend to have a substantially higher yield than traditional marijuana plants, producing more consumable marijuana.

The five men were subsequently indicted by a Southern District of Florida grand jury[2] for conspiring to possess with intent to distribute marijuana from April 2005 to July 9, 2005, and several related offenses.[3] After Gasca pled guilty, the

---

[1] There is no familial relationship between Miguel Sanchez and Antonio Sanchez.

[2] Kenya Azcuy was not indicted. She waived indictment and pled guilty on January 11, 2006; she pled guilty to one count of "knowingly and intentionally attempt[ing] to possess with intent to distribute a controlled substance." Azcuy was sentenced to two years of probation on July 14, 2006.

[3] The grand jury returned three indictments in this case. The case was tried on the eight-count superseding indictment (the "indictment") returned on March 10, 2006 after Gasca pled guilty. Count 1 charged Miguel and Antonio Sanchez, Hernandez, and Camejo with conspiring from April to July 9, 2005, as indicated in the text preceding this note, in violation of 21 U.S.C. § 846; Count 2 charged Miguel Sanchez with attempting to possess marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846; Count 3 charged the four defendants with attempting to possess marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846; Count 4 charged the defendants with a Hobbs Act conspiracy, taking marijuana forcibly from a person believed to be engaged in drug trafficking, in violation of 18 U.S.C. § 1951(a); Count 5 charged the defendants under the Hobbs Act with attempting forcibly to take the marijuana; Count 6 charged the defendants with carrying a firearm during and in relation to the

2

remaining defendants stood trial before a jury and were convicted.[4]  They now

appeal their convictions; Miguel and Antonio Sanchez and Camejo also appeal

their sentences.  We affirm all convictions and the sentence Miguel Sanchez

received.  We vacate and remand for resentencing, however, the sentences Camejo

and Antonio Sanchez received on Counts 4 and 5.

We organize this opinion as follows.  In part I, we relate the facts a

reasonable jury could have found from the evidence presented,[5] the verdicts the

jury reached, and the sentences the district court imposed.  Part II sets out the

issues the appellants have raised in appealing their convictions and sentences.

Parts III and IV address those issues respectively, and part V concludes.

---

crimes alleged in Counts 1, 3, 4, and 5; Count 7 charged the defendants with being felons in
possession of firearms in violation of 18 U.S.C. §§ 922(g)(1), 924(e); and Count 8 charged
Miguel Sanchez, Hernandez, and Camejo with attempting to possess with intent to distribute
marijuana on July 9, 2005 in violation of 21 U.S.C. §§ 841(a)(1), 846.

[4]  Gasca pled guilty to Counts 1, 3, and 5 on January 11, 2006, and on July 14, 2006,
received concurrent prison terms of 144 months and 60 months.  The remaining defendants, now
on appeal, were acquitted on Counts 6 and 7, but were otherwise convicted as charged.

[5]  The facts were established by the Government's proof.  None of the defendants, other
than Miguel Sanchez, presented a case in defense of the charges.  Sanchez's evidence, that the
police, after obtaining the defendants' DNA, did not compare the DNA to the DNA present on
firearms found at the scene of the defendants' arrests, shed no light on Sanchez's guilt or
innocence.  In appealing their convictions, none of the defendants challenges the sufficiency of
the evidence to convict.

I.

A.

The burglaries in this case took place on April 16, 2005, and July 1, 2005. A third burglary was to have taken place on July 9, 2005, but law enforcement, having been tipped off, arrested the conspirators (except for Antonio Sanchez) while en route to their target.

Law enforcement's first encounter with the conspiracy in this case occurred on the night of April 16, 2005, while the first burglary was in progress. The Miami-Dade Police Department received a call from a Homestead resident who reported that a burglary was in progress in his neighborhood. As officers converged on the scene, they discovered Miguel Sanchez fleeing from the residence the caller had identified.[6] They arrested Sanchez and, after securing him in a patrol car, searched the house.[7] The search revealed what appeared to be an

_____

[6] At appellants' trial, Gasca testified that Juan Bosh and Ozvaldo Palmer had driven him and Miguel Sanchez to the residence the caller had identified. The residence was a grow house. Gasca and Sanchez entered the grow house; Bosh and Palmer turned around and drove to Bosh's home a short distance away. On entering the grow house, Gasca and Sanchez observed numerous marijuana plants. The plants' leaves were too small for harvesting, so they left. Sanchez promptly had a change of mind, however, and reentered the house. At that point, Gasca noticed police cars approaching and fled on foot, intending to rendevous with Bosh and Palmer at Bosh's residence.

[7] The record does not indicate whether anyone was present in the house at the time of the search or whether the search was made pursuant to a warrant. After realizing that the house was a marijuana grow house, the officers contacted the FBI, and an agent came to the scene. At some point in time, the Miami-Dade police learned the identity of the owner of the house and arrested

4

indoor greenhouse, with heat lamps and over sixty marijuana plants. There were signs of a forced entry; the bars protecting a window had been pulled out, and the window had been broken. After the officers completed their search, they took Sanchez to a station house and booked him. He was released after posting a bail bond.[8]

On the night of July 1, 2005, five of the conspirators—the two Sanchezes, Hernandez, Camejo, and Gasca—drove to a grow house in Redlands, a rural area in Miami-Dade County. They had broken into the house the previous January and stripped the marijuana plants there; they anticipated that, with six months having gone by, the plants had generated new leaves suitable for harvesting.

They drove to the grow house in Gasca's Ford truck; Antonio Sanchez did the driving. On their arrival, four of the men—the two Sanchezes, Hernandez, and Camejo—entered the house; Gasca stayed behind in the truck. Moments later, multiple gunshots rang out, and the four came running back to the truck. As they ran, Miguel Sanchez dropped his revolver, so after they got to the truck, he and Camejo went back to retrieve it. They found the revolver and returned to the truck

him.

[8] The record does not indicate the crime for which Miguel Sanchez was charged, or the ultimate disposition of the charge. The inference to be drawn from the evidence presented at his trial was that he was free on bail until the conspiracy ended, on July 9, 2005.

5

just as two police cars were approaching. Two Miami-Dade police officers had been dispatched by radio to the scene in response to a "shots fired" report. They were joined by a Miami-Dade Agricultural Detective, who happened to be in the area and had been listening to the police radio.[9]

The detective shined her vehicle's spotlight into the truck and got a good look at the driver, whom she identified at trial as Antonio Sanchez. After the detective turned on the light, one of the police officers approached the truck's driver's door with her weapon drawn. She saw "five or six men" in the truck; they were yelling at each other in Spanish, using the Spanish word for "go."[10] She subsequently identified one of the men shouting "go" as Miguel Sanchez. At this point, Antonio Sanchez accelerated the truck, striking the officer and knocking her weapon from her hand. As the truck sped away, the officers followed in hot pursuit but soon lost sight of the truck. After calling off the pursuit, the officers returned to the crime scene. There, they recovered two firearms lying on the ground near where the truck had been parked.[11]

---

[9] The dispatcher knew that the detective was in the area and asked her to serve as the officers' back-up.

[10] The officer knew rudimentary Spanish, including the word for "go."

[11] The police were unable to trace the firearms to any of the conspirators.

To complete their investigation, the officers went to the house they believed to be the targeted grow house and obtained the occupant's consent to search it.[12] During the search, they discovered a bullet hole in a window and a bullet embedded in an interior wall. Although the officers found no marijuana, they noticed that the house had many of the accoutrements of a grow house, including special lights, rows of string for drying the plants, transformers, and insulation.

Meanwhile, Antonio Sanchez, still driving the truck, arrived at Gasca's house. At some point before the arrival, Miguel Sanchez told Gasca that as he was attempting to enter the target house through a broken window, a man in the house fired a shot at him and he returned fire.

On July 3, Yanexi Hernandez called the Florida Department of Law Enforcement (the "FDLE") and said that she had "some information."[13] The FDLE employee answering the telephone took down her number and told her that an FDLE agent would contact her sometime during the next two days. On July 5, Agent Frank Lobelsky called Yanexi. Yanexi said that she had information about the July 1 burglary attempt in Redlands. She told Lobelsky that a man whom her mother, Barbara Farias, was dating, Lazaro Camejo, had been involved in the July

_____

[12] The record does not identify the occupant.

[13] Yanexi Hernandez is not related to appellant Eduardo Hernandez. We refer to her as Yanexi.

7

1 burglary attempt, that her mother's relationship with Camejo was souring, and that her mother was concerned about being implicated in Camejo's wrongdoing. Lobelsky asked her if she and her mother would be willing to meet with him later in the day, and she agreed.

Lobelsky immediately contacted the Miami-Dade Police Department and spoke to detective Mitch Jacobs, who was assigned to the FDLE, about the substance of his conversation with Yanexi. That afternoon, Lobelsky, Jacobs, and Miami-Dade detective Juan Sanchez met with Yanexi and her mother at a local park. After Yanexi shared what Farias knew about the July 1 incident, she said that Camejo had told Farias that he, Gasca, Eduardo Hernandez, and Miguel Sanchez had burglarized a grow house on July 3,[14] and that he and the others planned to burglarize another grow house on July 12.

Lobelsky was a member of a Bureau of Alcohol, Tobacco, and Firearms ("ATF") task force, "STOP," which was investigating armed home invasion robberies perpetrated by career criminals. After meeting with Yanexi and her mother, Lobelsky briefed STOP's lead agent. STOP would prepare for the July 12 burglary.

---

[14] Although Farias was present throughout the meeting, she did not speak to Lobelsky and the detectives.

On July 9, Yanexi called Lobelsky and said that she, her mother, and her brother were to have dinner with Camejo at a local restaurant at 6 p.m. that evening.[15] The dinner came about as scheduled, and ended at 7:20 p.m. As soon as it was over and Camejo and Farias had left the premises in Farias's car, Yanexi and her brother met with Lobelsky and other task force officers outside the restaurant. She reported that while they were eating, Camejo received a phone call from Miguel Sanchez, and, after the call, said that he, Gasca, Miguel Sanchez, and others were going to burglarize a marijuana grow house that night. Yanexi received a call from her mother after she and Camejo arrived at her house. During the call, Farias told her that Camejo's truck bore a stolen license tag, and that when Camejo left her house, he wanted her to follow closely in her car so that the police would not discover the tag. Yanexi relayed this information to Lobelsky, and he instructed her to tell her mother to do as Camejo requested.

Armed with this information, the task force set up surveillances at three residences: Camejo's, Farias's, and Gasca's. Meanwhile, Yanexi and her brother drove to Farias's house and prepared to go along with Camejo's plan: Farias and Yanexi would follow Camejo's truck in Farias's car.

---

[15] Before Yanexi met Camejo at the restaurant, Lobelsky, Jacobs and another Miami-Dade detective, and an ATF special agent, Jessica Rebago, met Yanexi. Rebago equipped Yanexi with a recording device (which failed to function).

At 8:30 p.m., the two vehicles left Farias's house with the task force a short distance behind.[16]  Fifteen minutes later, Camejo pulled into a gas station.  Farias did, too.  Camejo got out of his truck, walked to Farias's car, and told Farias that she could return home.  Camejo then left the gas station and drove to Gasca's residence, arriving at 9:00 p.m.  Officers of the task force observed Camejo enter the residence.  After five to ten minutes, Camejo and Miguel Sanchez left the house, got into Camejo's truck, and drove away.  Moments later, Gasca, Hernandez, and Azcuy departed in a white Thunderbird automobile, with Azcuy driving.  The Thunderbird immediately caught up to the truck, and the two vehicles drove in tandem, practically bumper to bumper, toward the targeted grow house.

At a traffic light, officers of the task force stopped both vehicles and arrested the occupants.  A search of Camejo's truck uncovered a ski cap and a large, empty garbage bag.  A search of the Thunderbird revealed a camouflage shirt, a screwdriver, a baseball cap, and a set of bolt cutters.  Next to where Hernandez had been sitting, the officers also found a blue gym bag containing two rolls of large garbage bags, a crow bar, a knife, a saw, a hammer, a flashlight, two

---

[16]  While at Farias's house, Camejo changed clothing.  He left the house wearing dark clothes, carrying gloves and a crowbar.

cutters, white rope, and a pair of pliers. The officers also found a notebook belonging to Azcuy, which contained the address of the targeted grow house. Gasca, Hernandez, and Camejo were carrying cell phones. The cell phones were seized along with Miguel Sanchez's personal phone book, which contained numerous telephone numbers, including those for Gasca's, Hernandez's, and Camejo's cell phones.

After they were taken into custody, the arrestees were advised of their <u>Miranda</u> rights. All waived their rights and submitted to questioning. Hernandez claimed that he was going to a party that evening, but he was unable to name either the location or host of the party. Asked if he was acquainted with the four who had been arrested with him, he said that he knew Gasca—he lived with Gasca—but none of the others.

Camejo stated that he was on his way to perform an odd job, but he could not explain what the job was or its location. He knew Miguel Sanchez, the passenger in his truck, but not his name, and he was unacquainted with those traveling in the Thunderbird. Miguel Sanchez, unaware that the officers had seen him leave Camejo's house in Camejo's truck, said that he did not know Camejo. He was hitching a ride, and Camejo happened to pick him up.

11

On July 11, armed with a search warrant, task force officers searched Gasca's residence and garage. They found a black Ford truck in the garage, which was identified as the Ford truck the Miami-Dade police encountered at the scene of the July 1 burglary attempt. A search of the residence revealed a bag with marijuana residue, walkie talkies, gloves, ropes, ski masks, and a note containing the address of the targeted grow house that the police had prepared for on July 9. The same address appeared in Azcuy's address book.

Roughly three months later, Antonio Sanchez was arrested and his cellular telephone seized. He waived his Miranda rights and denied knowing any of those arrested on July 9. After the police told him they had found Gasca's name in his cell phone directory, he admitted knowing Gasca. He also admitted that he may have been present in Gasca's truck when the police approached it on July 1.

Metro PCS, Inc. ("MetroPCS") provided the cellular phone service for the cell phones that Gasca, Hernandez, and Camejo possessed at the time of their July 9 arrests, and also for the phone possessed by Antonio Sanchez when he was arrested in October. Call records the company prepared from its database, and a summary of those records prepared by the prosecution, indicated that, between April 1 and July 9, 2005, numerous calls were made to and from those cell phones

and a cell phone Miguel Sanchez had obtained under a fictitious name.[17]  Maps

prepared by the prosecution from the information contained in the call records

showed the general location of the subject cell phones in relation to specific cell

phone call towers at the time the phones were used to make or receive calls on the

nights of July 1 and July 9, and effectively placed all of the cell phones in close

proximity to the targeted grow houses.

### B.

The jury found the defendants guilty as charged, except for Counts 6 and 7,

of which they were acquitted.  The district court sentenced the defendants to

concurrent prison terms as follows: Miguel Sanchez, 60 months on Counts 1, 2, 3,

and 8, and 200 months on Counts 4 and 5; Antonio Sanchez, 120 months on

Counts 1 and 3, and life on Counts 4 and 5; Hernandez, 120 months on Counts 1,

3, and 8, and life on Counts 4 and 5; and Camejo, 120 months on Counts 1, 3, and

8, and life on Counts 4 and 5.  The life sentences Antonio Sanchez and Camejo

received were imposed in consequence of the Government's pretrial filing of an

information, pursuant to 21 U.S.C. § 851,[18] which alleged that those defendants

---

[17]  Sanchez had subscribed to a cell phone with MetroPCS using the name John Smith.

[18]  21 U.S.C. § 851 (a)(1)provides in relevant part, "No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial . . . the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing

were subject to mandatory life sentences on Counts 4 and 5 under the "three-strikes law," 18 U.S.C. § 3559(c),[19] because they previously had been convicted of "2 or more serious violent felonies" or "one or more serious violent felonies and one or more serious drug offenses."[20]

## II.

The defendants, now appellants, challenge their convictions on the ground that the district court abused its discretion in its rulings on evidentiary objections.

---

the previous convictions to be relied upon."

[19] 18 U.S.C. § 3559(c) provides:

Imprisonment of certain violent felons.—

(1) Mandatory life imprisonment.— Notwithstanding any other provision of law, a person who is convicted in a court of the United States of a serious violent felony shall be sentenced to life imprisonment if—

(A) the person has been convicted (and those convictions have become final) on separate prior occasions in a court of the United States or of a State of—

(i) 2 or more serious violent felonies; or

(ii) one or more serious violent felonies and one or more serious drug offenses; and

(B) each serious violent felony or serious drug offense used as a basis for sentencing under this subsection, other than the first, was committed after the defendant's conviction of the preceding serious violent felony or serious drug offense.

[20] The Government also filed notice of intention to seek a life sentence for Hernandez. Because Hernandez does not appeal his sentence, however, we do not review the facts giving rise to his sentence.

Their principal challenge concerns the district court's admission into evidence of the MetroPCS call records, showing the calls going to and from the cell phones seized from Gasca, Antonio Sanchez, Hernandez, and Camejo and the cell phone possessed by Miguel Sanchez during the course of the Count 1 conspiracy, the summary of those records, and the maps locating the subject cell phones when they were used in connection with the calls made on the nights of July 1 and 9. Appellants' other challenges to the court's evidentiary rulings are meritless; hence, we dispose of them in the margin.[21]

---

[21] These challenges are that the court abused its discretion in (1) not declaring a mistrial when a police officer testified that he investigated "career criminals," thereby creating the inference that the defendants were "career criminals"; and (2) allowing a police officer to present testimonial hearsay evidence when she testified that the police dispatcher sent her to the scene of the July 1 burglary because, according to the dispatcher, a caller had reported that shots had been fired. The gravamen of the challenge is that appellants were denied their Sixth Amendment right, as recognized in Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L .Ed. 2d 177 (2004), to confront the caller. Miguel Sanchez and Camejo contend (3) that the court abused its discretion in admitting into evidence their 1991 convictions for committing a burglary (together).

The first argument fails because the court instructed the jury that it "must not consider the types of cases that this agent has investigated in the past as relevant to this case." The curative instruction was adequate under the circumstances.

The second argument fails as well. The officer's statement was not admitted for the truth of the dispatcher's statement—that shots had been fired—and therefore did not constitute testimonial hearsay. Rather, the statement was admitted solely for the purpose of explaining why the officer was sent to the scene and the danger the officer thought she might face on arrival. That the officer's statement was admitted solely for such purpose was made plain by the court's instruction to the jury that it was not to consider the caller's statement for the truth of its contents, but only for the officer's state of mind. Accordingly, we are unable to say that, in light of the instruction, the court abused its discretion in admitting the evidence.

As for the third argument, Camejo and Sanchez's 1991 conviction was introduced into evidence for the limited purpose of rebutting Sanchez's post-arrest statement to the police that he did not know Miguel Sanchez, as well as Camejo's post-arrest statement that (on July 9) he was merely going to a job, implying that Sanchez was a stranger just riding along in his truck. In

15

Three defendants appeal their sentences. Miguel Sanchez contends that the district court abused its discretion in departing from the Guidelines sentence range in sentencing him on Counts 4 and 5 of the indictment. Antonio Sanchez and Camejo challenge the validity of the information the Government filed under 21 U.S.C. § 851 in seeking sentences of life imprisonment on Counts 4 and 5.

III.

We now consider the admissibility of the MetroPCS call records and the summary of the calls and maps the prosecution prepared from those records. The Government delivered copies of the call records to defense counsel seven months prior to trial as part of its discovery. The day before the trial began, defense counsel received the summary and the maps the prosecution had prepared. At this time, defense counsel informed the district court that it objected to the admissibility of the call records, the summary, and the maps. Counsel also

---

United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003), we held that evidence of past crimes that is relevant to an issue other than the defendant's character is admissible if the probative value of the evidence outweighs any undue prejudice. Here, it is clear that the 1991 burglary was relevant because, when Camejo and Miguel Sanchez were arrested, (1) they were riding in a truck containing items that could be used as burglary tools, (2) they both indicated a lack of knowledge of each other, and (3) they both claimed that their drive was purely innocent. The prior 1991 burglary tended to disprove their post-arrest statements, illustrated intent to commit criminal activity together, and tended to disprove accident or mistake. Admission for these purposes is exactly what Fed. R. Evid. 404(b) allows. Any undue prejudice that may have existed was mitigated by the court's limiting instruction, which was given immediately after the evidence was introduced.

requested that the Government make the custodian of MetroPCS's records available for a private interview. The Government agreed, and defense counsel interviewed Janan Chandler. It was understood by the court and the parties that defense counsel's objections to the Government's evidentiary submissions would be heard at trial, in the absence of the jury, at the time the prosecution indicated that it wanted to offer the call records in evidence.

Defense counsel's objections were heard during the ninth day of the trial, near the end of the Government's case in chief. In the absence of the jury, the Government proffered the admissibility of the call records, establishing the following through the testimony of Janan Chandler:

MetroPCS maintains several hundred towers for receiving calls from MetroPCS cell phones in the Miami-Dade metropolitan area. The towers are grouped together in "switches." When a call is made, the tower nearest to the cell phone picks it up[22] and electronically records the following:[23]

> 1) a letter, e.g., A, and a three-digit number, e.g., 123, identifying respectively the tower's switch and the tower's identity;

---

[22] On cross-examination, Chandler said that it was possible that a tower further away than the closest tower picked up the call because it had a stronger "signal." This possibility had no bearing on the admissibility of any of the objected-to evidence.

[23] The tower records information in addition to that indicated in paragraphs 1) through 6), but that information is not pertinent here.

2) the geographic "region"[24] of the tower from which the call is made;
3) the caller's phone number, i.e., the number used to place calls to the caller's cell phone;
4) the date and time the call originates;
5) the telephone number the caller dialed; and
6) the duration of the call in minutes and seconds.[25]

The tower stores this information for two to three days and then electronically transmits it to VeriSign, which has contracted with MetroPCS to store the information in a database.[26] MetroPCS maintains computer software designed to retrieve the information. In this case, the Government served MetroPCS with a subpoena calling for the information shown in the call records at issue. MetroPCS obtained the information by activating the software designed to retrieve it.

Defense counsel objected to the introduction of the call records on three grounds. First, the database for the records is maintained by a contractor, not MetroPCS. Second, the database is not a MetroPCS business record within the intendment of Rule 803(6) of the Federal Rules of Evidence. Third, assuming that

---

[24] The geographic areas a tower covers are designated north, southeast, and southwest. The regions completely surround the towers.

[25] The call begins when the caller pushes the "send" button on his cell phone and terminates when the caller pushes the "end" button.

[26] VeriSign stores the information for approximately six months, with the actual length of time being dictated by MetroPCS's needs.

the database qualifies as a business record, the extracted call records are not a reliable indicator of the information contained in the database.

The first ground is frivolous. Appellants cite no authority even remotely questioning the sort of contractual relationship MetroPCS had with VeriSign. We therefore treat the database as MetroPCS's. As for the second ground, it is clear that the database was a replication of the information recorded by MetroPCS's towers. The information was recorded contemporaneously with the transaction it depicts, while the transaction—the cell phone call—was underway. Appellants do not question the reliability of the information, and we cannot imagine a basis for doing so. There is no evidence that the calls made were not directed to the numbers dialed, whether the calls were made from one MetroPCS subscriber to another MetroPCS subscriber or from a MetroPCS subscriber to a number serviced by another carrier, or vice versa. Furthermore, MetroPCS relied on the database for maintaining the towers in operable condition and for reconciling the billings it received from other carriers for completing calls made from MetroPCS cell phones to cell phones serviced elsewhere. The third ground of appellant's objection is, essentially, that the software MetroPCS used to extract the information from the database and display it was defective and manipulatable; as such, it was not reliable. Appellants have pointed to nothing in Chandler's testimony, either on

19

direct or cross-examination, to support this ground, and we find no support for it in the record. In sum, appellants' argument that the district court abused its discretion in admitting the call records into evidence fails.

Given the failure of appellants' objection to the call records, appellants' argument that the summary of those records and the maps were inadmissible boils down to an argument that the summary and the maps, though accurate, constituted nothing more than argument, which should have been restricted to the prosecution's closing argument to the jury.[27] In overruling appellants' objection to these exhibits, the district court instructed the jury that they were not evidence, and that the evidence consisted of MetroPCS's database and the call records reflecting information contained in the database. Consequently, we find no abuse of discretion in the manner in which the court handled the summary and the maps.

In that we discern no basis in the district court's challenged evidentiary rulings for setting aside any of the verdicts in this case, we are bound to affirm appellants' convictions and therefore do so.

_____

[27] The summary and the maps were introduced through the testimony of a Miami-Dade detective who had reviewed the call records. Antonio Sanchez and Camejo argue that the summary should have been introduced through the testimony of Janan Chandler, since she had prepared the call records, and that having the detective, rather than Chandler, introduce the summary deprived them of their Sixth Amendment right of confrontation—their right to cross-examine Chandler. The argument, which appellants raise for the first time on appeal, is patently frivolous.

20

IV.

Having found no basis for vacating appellants' convictions in the district court's challenged evidentiary rulings, we turn to the objections Camejo, Antonio Sanchez, and Miguel Sanchez made to the sentences they received on Counts 4 and 5 of the indictment. We begin with Camejo's objections, then consider those interposed by the Sanchezes.

A.

Prior to trial, the Government notified the district court and Camejo, pursuant to 18 U.S.C. § 851, that if Camejo was found guilty on Counts 3, 4, or 5, it would ask the court to impose a life sentence, pursuant to 18 U.S.C. § 3559(c), because he previously had been convicted in Florida circuit court of what § 3559(c)(1)(A) deemed a "serious violent felony" and two "serious drug offenses."[28] The felony conviction was for escape, in violation of Fla. Stat. § 944.40. The drug convictions were on two counts of selling, delivering, manufacturing, or possessing with intent to deliver cocaine within 1,000 feet of a school, in violation of Fla. Stat. § 893.13(1)(c) ¶ 1, .(1)(d) ¶ 1, .(1)(e) ¶ 1.[29] The

---

[28] Although the Government sought a life sentence for Camejo on Count 3, Camejo was sentenced to 120 months' concurrent imprisonment on Counts 1, 3, and 8, so only the life sentences Camejo received for Counts 4 and 5 are at issue here.

[29] The two drug offenses were adjudicated in one judgment of conviction.

21

narrative statements contained in the charging information for those offenses indicate that Camejo had sold and delivered cocaine but did not disclose the quantity of cocaine involved. Camejo argues that because the judgment of conviction did not specify the quantity, the district court should not have relied on the offenses in imposing his life sentences, for they did not qualify as "serious drug offenses" under § 3559(c). A state drug offense qualifies as a "serious drug offense" under § 3559(c) only if the offense, if prosecuted in federal court, "would have been punishable under [21 U.S.C. § 841(b)(1)(A)] or [21 U.S.C. § 960(b)(1)(A)]." 18 U.S.C. § 3559(c)(2)(H)(ii).

Camejo did not present this argument to the district court at the time of sentencing. We therefore consider it under the plain error doctrine. United States v. Abraham, 386 F.3d 1033, 1037 (11th Cir. 2004).[30] The Government concedes

_____

[30] We have said:

> To establish plain error, a defendant must show there is (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, we may exercise our discretion to recognize a forfeited error, but only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings. Under plain error review, the defendant bears the burden of persuasion with respect to prejudice or the effect on substantial rights. When neither the Supreme Court nor this Court has resolved an issue, and other circuits are split on it, there can be no plain error in regard to that issue.

United States v. Evans, 478 F.3d 1332, 1338 (11th Cir. 2007) (alteration in original) (quoting United States v. Moriarty, 429 F.3d 1012, 1019 (11th Cir. 2005) (per curiam)).

that the district court plainly erred in treating the Florida drug offenses as serious drug offenses under § 3559(c) and then imposing the mandatory life sentences. The Government concedes this point because, to qualify as a "serious drug offense" under § 3559(c)(2)(H)(ii), the drug offenses must have been punishable under 21 U.S.C. § 841(b)(1)(A). Section 841(b)(1)(A), however, is limited only to offenses involving "5 kilograms or more" of cocaine or "50 grams or more" of cocaine base. The error affected Camejo's substantial rights because it resulted in sentences of life imprisonment rather than statutory maximum terms of 20 years' imprisonment. Since the error affected Camejo's substantial rights and "seriously affected the fairness, integrity, or public reputation of the judicial proceedings," United States v. Bennett, 472 F.3d 825, 834 (11th Cir. 2006), we vacate the sentences on Counts 4 and 5 and remand those counts for resentencing.

B.

Antonio Sanchez received life sentences on Counts 4 and 5 because, according to the information the Government filed under 18 U.S.C. § 851, he previously had been convicted in state court for escape and for trafficking in cannabis and in federal court for conspiracy to import and possess with intent to distribute cocaine. He objected to the district court's imposition of his life sentences on the ground that his conviction for escape did not qualify as a "serious

23

violent felony" under 18 U.S.C. § 3559(c). He now appeals the district court's refusal to sustain the objection.

Antonio Sanchez concedes that he was convicted under the Florida statute making the crime of escape a felony, Fla. Stat. § 944.40,[31] but argues that, although he was convicted of escape, his actual conduct in committing that offense did not constitute a violation of that statute. Instead, his conduct violated Fla. Stat. § 945.091(4), which punishes a failure to return.[32] In the alternative, he argues that his escape conviction is void because he was convicted of conduct for which he was not charged.

---

[31] Fla. Stat. § 944.40 provides:

Any prisoner confined in any prison, jail, private correctional facility, road camp, or other penal institution, whether operated by the state, a county, or a municipality, or operated under a contract with the state, a county, or a municipality, working upon the public roads, or being transported to or from a place of confinement who escapes or attempts to escape from such confinement commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. The punishment of imprisonment imposed under this section shall run consecutive to any former sentence imposed upon any prisoner.

Florida law provides that a person convicted of a "felony of the second degree" is punishable to "a term of imprisonment not exceeding 15 years." Fla. Stat. § 775.082(3)(c).

[32] Fla. Stat. § 945.091(4) provides:

The willful failure of an inmate to remain within the extended limits of his or her confinement or to return within the time prescribed to the place of confinement designated by the department shall be deemed as an escape from the custody of the department and shall be punishable as prescribed by law.

24

We review de novo whether a conviction qualifies as a crime of violence under 18 U.S.C. § 3559(c). See United States v. Evans, 478 F.3d 1332, 1341 (11th Cir. 2007). Except for convictions that are presumptively void, a defendant may not use a sentencing proceeding to mount a collateral attack on a prior conviction. See United States v. Phillips, 120 F.3d 227, 231–32 (11th Cir. 1999).

Under § 3559(c), an offense is a "serious violent felony" if it meets one of several sets of criteria, one of which is that the offense is "punishable by a maximum term of imprisonment of 10 years or more [and] . . . by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense." 18 U.S.C. § 3559(c)(2)(F)(ii).

The district court did not err in concluding that Sanchez's conviction for escape was a "serious violent felony." A conviction for escape under Florida law is a serious violent felony within the meaning of § 3559(c) because it is punishable by a sentence of up to 15 years and involves a substantial risk that physical force against the person of another may be used. Abraham, 386 F.3d at 1038.

Sanchez's alternative argument is misplaced. Generally, a defendant may not use sentencing proceedings collaterally to attack a prior conviction. See Phillips, 120 F.3d at 231–32. Even if we accepted his argument, however, the result would be the same. In essence, as we read Sanchez's brief, he is contending

25

that his criminal conduct made him eligible only for a violation of Fla. Stat. §

945.091(4), and not Fla. Stat. § 944.40. Conduct that violates § 945.091(4),

however, is deemed a violation of § 944.40. See Fla. Stat. § 945.091(4) ("The

willful failure of an inmate . . . to return within the time prescribed to the place of

confinement . . . shall be deemed as an escape . . . and shall be punishable as

prescribed by law.") (emphasis added).[33]

Antonio Sanchez also argues that, as applied, 18 U.S.C. § 3559(c) violates

the equal protection component of the Fifth Amendment's Due Process Clause

because it permits defendants who have been convicted of robbery or arson to

delve into the circumstances of their convictions to show that their offenses were

not crimes of violence, while he is not permitted to show that his escape

conviction was not a crime of violence. He contends that the distinctive

classification of robbery and arson lacks rational basis because (1) escape by

___

[33] In so holding, we are mindful of the Supreme Court's recent decision in Chambers v. United States, 555 U.S. __, 129 S. Ct. 687, 172 L. Ed. 2d 484 (2009) (holding that the Illinois crime of failure to report for imprisonment is not a violent felony for purposes of the Armed Career Criminal Act). We nonetheless find that decision inapposite. There, the Court held that a criminal defendant sentenced to 11 weekends of imprisonment could not have been found to have had the "'purpose, "violent," and "aggressive" conduct'" required to meet the statutory definition of a "violent felony" by failing to report to the prison for four of those weekends. Id. at __, 129 S. Ct. at 692 (quoting Begay v. United States, __ U.S. __, 128 S. Ct. 1581, 1586 (2008)). This case is distinct. Here, Antonio Sanchez pled guilty to escape, not a failure to report. Moreover, the record suggests that he had the specific intent to escape from prison—he used the scheduled release as a ruse to leave the institution of his confinement for more than a month.

26

failure to return has no more potential for violence than any arrest; (2) there are no circumstances under which a robbery or arson can be nonviolent; and (3) the state has advanced no rational reason to support the preferential treatment of robbers and arsonists.

We review challenges to the constitutionality of a sentence de novo. United States v. Paz, 405 F.3d 946, 948 (11th Cir. 2005). Even a cursory reading of the challenged statute reveals the frivolousness of Sanchez's argument. The "three strikes" law defines "serious violent felonies" as a series of federal crimes listed in the statute or as

> (ii) any other offense punishable by a maximum term of imprisonment of 10 years or more that has as an element the use, attempted use, or threatened use of physical force against the person of another or that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense.

18 U.S.C. § 3559(c)(2)(F)(ii).

Under the "three strikes" law, a defendant can show that certain prior serious violent felonies do not qualify as "strikes." In particular, the statute provides:

> (3) Nonqualifying felonies.—
>
>> (A) Robbery in certain cases.—Robbery, an attempt, conspiracy, or solicitation to commit robbery; or an offense

27

described in paragraph (2)(F)(ii) shall not serve as a basis for sentencing under this subsection if the defendant establishes by clear and convincing evidence that—
> (i) no firearm or other dangerous weapon was used in the offense and no threat of use of a firearm or other dangerous weapon was involved in the offense; and
> (ii) the offense did not result in death or serious bodily injury (as defined in [18 U.S.C. §] 1365) to any person.

(B) Arson in certain cases.—Arson shall not serve as a basis for sentencing under this subsection if the defendant establishes by clear and convincing evidence that—
> (i) the offense posed no threat to human life; and
> (ii) the defendant reasonably believed the offense posed no threat to human life.

18 U.S.C. § 3559(c)(3) (emphasis added).

It is apparent from a reading of the statute that Sanchez's equal protection argument is inapposite. Section 3559(c)(3) treats robbery exactly the same as it treats Sanchez's escape conviction. That is, just as he could challenge a robbery conviction, he could challenge his escape conviction. We accordingly reject Antonio Sanchez's equal protection argument.

Nonetheless, we vacate and remand Antonio Sanchez's sentence. Although phrased as an equal protection challenge, Sanchez's argument, at its heart, contests the district court's application of the "escape clause" and the fact that he was not

28

given an opportunity to challenge his sentence under § 3559(c)(3)(A).[34]  Indeed, in

this case, the district court and the parties proceeded under the mistaken

assumption that only convicted robbers and arsonists were allowed to use §

3559(c)(3)(A) to challenge their convictions.  Furthermore, the Government has

---

[34]Sanchez did not waive this objection by making his misguided equal protection argument.  In United States v. Jones, 899 F.2d 1097, 1102–03 (11th Cir. 1990), overruled in part on other grounds by United States v. Morrill, 984 F.2d 1136, 1137 (11th Cir. 1993) (en banc), we held that, absent manifest injustice, a party waives any objections to a sentence if the party fails to object or fails to specify the grounds for an objection after the trial court imposes the sentence. This rule ensures that the trial court is made aware of any possible errors in time to correct them. See United States v. Weir, 51 F.3d 1031, 1032 (11th Cir. 1995) (discussing "the mandate in Jones that the sentencing court be informed of the [party's] objections before appeal"). "To preserve an issue for appeal, an objection must be sufficiently detailed to allow the trial court an opportunity to correct any arguable errors before an appeal is taken." United States v. Hoffer, 129 F.3d 1196, 1202 (11th Cir. 1997).
Although Sanchez mistakenly believed that § 3559(c)(3)(A) did not apply to him, he nonetheless indicated his desire to challenge his life sentence under the statute when he argued to the district judge that the section violated equal protection by letting only robbers and arsonists—but not escapists—challenge their sentences.  The transcript from the sentencing hearing makes clear that Sanchez was requesting an opportunity to prove that his escape conviction was nonviolent.  Sanchez's counsel argued, "[W]hy shouldn't he have that same right [as a robber or arsonist] to go into the facts of the case, to try to have at least the ability to say it was an escape, but it be [sic] wasn't a violent one?"  Moreover, the district judge and the prosecutor also understood that Sanchez was asking for an opportunity to prove that his escape was nonviolent (although both also misread the statute).  After Sanchez made his argument at the sentencing phase, for example, the judge asked the prosecutor, "[W]hy are we treating these people, meaning people convicted of these types of crimes, differently?"  Later during his argument, the prosecutor observed, "I think really it's just more he's raising a due process argument saying that he should be able to challenge the nature of the offense, whether it's a serious violent felony or not."  Thus, Sanchez's objection, even though based on a misunderstanding of the statute, was enough to tell the district judge that he wanted to prove that his escape conviction was not a serious violent felony under §3559(c)(3)(A) and was thus sufficient to preserve his objection under Jones.

29

conceded that Sanchez could have challenged his conviction.[35]  We thus vacate

Antonio Sanchez's sentence on Counts 4 and 5 and remand his case to the district

court so that Sanchez may have the opportunity to prove his conviction was a

nonqualifying felony under § 3559(c)(3)(A).

C.

Miguel Sanchez received a sentence of 200 months' imprisonment on each

of Counts 4 and 5.  In fashioning these sentences, the district court began with the

presentence investigation report (the "PSI").  In the PSI, the probation officer

initially recommended a base offense level of 20, U.S.S.G. § 2B3.1(a), a 7-level

enhancement for the discharge of a firearm, U.S.S.G. § 2B3.1(b)(2)(A), and a 1-

level enhancement because the object of the offense was a controlled substance,

U.S.S.G. § 2B3.1(b)(6), for a total offense level of 28.  Sanchez's criminal history

included nine conviction groups.  With a criminal history category of V, the

probation officer recommended a Guidelines sentence range of 130-162 months'

imprisonment.  The probation officer noted that the non-counting of some of

_____

[35]In a memorandum to this Court dated May 30, 2008, the Government states that
Sanchez could have challenged his conviction—and likely prevailed—under the affirmative
defense provision of § 3559(c)(3)(A) if his escape conviction was indeed for a nonviolent
"walkaway."

Sanchez's convictions was a factor that might warrant an upward departure from that sentence range.

At the sentencing hearing, the Government requested an upward departure because, it contended, Miguel Sanchez's criminal history category inadequately reflected his true criminal history. The Government emphasized the convictions for which Sanchez had not received criminal history points, and argued that his past criminal behavior demonstrated that the only way to prevent him from committing further crime would be to incarcerate him. The Government requested that the district court increase his criminal history to Category VI, then increase his offense level to 31 (including a 2-level enhancement for reckless conduct causing a risk of death), and then sentence Sanchez to 235 months' imprisonment on Counts 4 and 5. Sanchez objected to such upward departure.

At the sentencing hearing, the court concluded that

[r]eading the . . . [PSI], the defendant arrived in this country in May of 1991, and commits his first offense in November [of that year], and then the record is replete with crime after crime, situation after situation.

As the government pointed out, the longest period of time he goes without any contact with the Criminal Justice System are times that he is actually incarcerated. I rarely find this, but I do find in this case that the criminal history of five under represents this defendant's criminal history. I believe that the appropriate criminal history

31

category in this matter should be a criminal history category of six, and I am granting the government's motion for an upward departure.

Therefore, the total offense level in this matter is 28, and the criminal history category should be considered a six.

My reading of a criminal history category of six at the range of total offense level of 28 would place the defendant in a range of 140 to 175 months. I do not believe that the guideline range accurately and adequately reflects this defendant's history and the factors in 3553, and I plan to sentence the defendant accordingly.[36]

As such, the district court sentenced Sanchez to 200 months' imprisonment. With this background, we now review the arguments Sanchez advances on appeal. We begin with his objections to the court's imposition of sentence.

Miguel Sanchez argues that his sentences on Counts 4 and 5 were procedurally unreasonable because the district court failed to consider the sentencing factors set out in 18 U.S.C. § 3553(a).[37] He notes that the district

---

[36] According to the PSI considered by the district court, Miguel Sanchez actually arrived in the country in 1980 and committed his first crime in November of 1980. This disparity is not of consequence here.

[37] 18 U.S.C. § 3553(a) provides, in pertinent part:

(a) Factors to be considered in imposing a sentence.— . . . . The court, in determining the particular sentence to be imposed, shall consider—

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed—

>> (A) to reflect the seriousness of the offense, to promote

32

court's only reference to § 3553(a) was its statement that it believed that the

Guidelines sentence range did not adequately reflect his criminal history and that

the court therefore planned to sentence him accordingly.  Sanchez further argues

---

respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

. . . .

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission . . . ;

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission . . .

. . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

33

that the court failed to consider all of the required § 3553(a) factors. Further, he contends that his sentences were substantively unreasonable, emphasizing that the variance was imposed on the basis that the Guidelines sentence range did not adequately represent his criminal history, even though the court had already imposed an upward departure based on his criminal history.

Once the district court has correctly calculated the Guidelines sentence range, we review the sentence imposed for reasonableness. United States v. Williams, 435 F.3d 1350, 1353 (11th Cir. 2006).

> After [United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005)], a sentence may be reviewed for procedural or substantive unreasonableness. A sentence may be unreasonable if it is the product of a procedure that does not follow Booker's requirements, regardless of the actual sentence. Additionally, a sentence may be substantively unreasonable regardless of the procedure used.

United States v. Hunt, 459 F.3d 1180, 1182 n.3 (11th Cir. 2006). "[C]ourts of appeals must review all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard." Gall v. United States, 552 U.S. 38, 40, 128 S. Ct. 586, 591, 169 L. Ed. 2d 445 (2007). "When conducting this review [of the substantive reasonableness of a sentence], the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range."

Id. at 51, 128 S. Ct. at 597. A defendant challenging his sentence bears the burden of establishing that it is unreasonable. United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005).

In general, the district court is not required "to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors." United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005). It is sufficient that the district court considers the defendant's arguments at sentencing and states that it has taken the § 3553(a) factors into account. Id. at 1330; Talley, 431 F.3d at 786.

After careful review of the record, we conclude that Miguel Sanchez's sentences on Counts 4 and 5 were procedurally and substantively reasonable. First, the district court correctly calculated the Guidelines sentence range and then, within the Guidelines framework, properly imposed an upward departure. Second, there was no procedural error. In announcing that it was going to impose an upward variance, the district court expressly noted that it had concluded that the Guidelines sentence range was insufficient in light of Sanchez's criminal history and the § 3553(a) factors. The court was not required to discuss each of the § 3553(a) factors, especially when the only arguments Sanchez made at sentencing went to his criminal history. See Scott, 426 F.3d at 1329–30. Third, the district

35

court did not abuse its discretion when it determined that Sanchez's criminal history was sufficiently compelling to justify not only an upward departure that increased the guidelines range, but also an upward variance above that guidelines range.  See Gall, 552 U.S. at 49–52, 128 S. Ct. at 596–98.

## V.

For the reasons stated above, the convictions of Miguel Sanchez, Antonio Sanchez, Hernandez, and Camejo are AFFIRMED.   The sentence Miguel Sanchez received on Counts 4 and 5 is AFFIRMED as well.  The sentences Antonio Sanchez and Camejo received on Counts 4 and 5 are VACATED and their cases are REMANDED for resentencing on those counts.

SO ORDERED.