[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13006

_____

D.C. Docket No. 1:18-cr-00008-JRH-BKE-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DETRA WILEY PATE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(April 21, 2021)

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR, and ED CARNES, Circuit Judges.

PER CURIAM:

Detra Pate appeals her convictions and sentence for healthcare fraud offenses. She contends the district court made three errors at trial and two at sentencing. As to the trial errors, Pate argues the court abused its discretion by admitting wealth evidence and by refusing to admit impeachment evidence, and also that one slip up that the district court made in giving part of the jury instructions violated her Fifth Amendment right to silence. As to the sentencing errors, she argues the court incorrectly found that the fraud involved sophisticated means and that she obstructed justice.

## I.  THE FACTS AND PROCEDURAL HISTORY

### A.  The Facts

Detra Pate was the owner and CEO of Southern Respiratory, a durable medical equipment company. In that role, she was in charge of billing, ordering equipment, and the day-to-day operations of the company, including managing and training employees.

Southern rented out and sold durable medical equipment. The sales and payment process went like this. First a physician prescribed to Southern's patients a piece of equipment, confirming the medical necessity by the written prescription or a signed, written order. Then Southern completed a sales order for that equipment. Sometimes the patient signed for and left with the equipment the same day. Other times Southern had one of its employees deliver the equipment to the

2

patient.  When a patient received the equipment, a Southern employee filled out a delivery ticket specifying which equipment was going to which patient and the date and time the patient received the equipment.

After all of that was done, Southern would bill the patient's private insurance or, beginning in 2011, would bill Medicare.  The bills were submitted to the insurer or Medicare through Southern's billing program software, called Brightree.  The Brightree program created an "audit trail" by tracking which employee used the system to add, remove, or alter information for a particular claim and by logging the details of each claim — what equipment was delivered to whom and when, and the name of the prescribing physician.

Medicare occasionally audits claims submitted to it by providers, sometimes before it pays the claim and sometimes after.  If Medicare audits a claim, it requests from the provider a physician's order, which is a prescription or other written order showing the medical need for a particular piece of durable medical equipment, and a delivery ticket, which is a written confirmation that the prescribed equipment was delivered to, or taken by, the patient.  The physician's order must be signed by the prescribing physician, and the delivery ticket must include the patient's name, address, and signature.  If the provider cannot, or otherwise fails to, provide a physical copy of the requested documents, Medicare

3

denies the claim and seeks a refund of any payment already made by it to the provider.

Because of the possibility of audits, providers like Southern must keep physical copies of physicians' prescriptions or other orders and delivery tickets for all Medicare claims. And for Southern to "pass" an audit, those copies must be examined and found to match the bills submitted to Medicare. That is how the system was supposed to work.

Between 2014 and 2017, however, Southern filed Medicare claims requesting payment for wheelchairs that were different from, and more expensive than, those that physicians had prescribed for Southern's patients. And Southern also filed Medicare claims that resulted in payments for wheelchair accessories and other supplies that were never prescribed by a doctor and that were never obtained by any of Southern's patients.

Because Southern billed Medicare for medical equipment that wasn't prescribed, or that was different from what had been prescribed, the physicians' orders and delivery tickets in its patient files often didn't match the information logged by the Brightree billing program's audit trail. So whenever Medicare audited a fraudulent claim, Southern had to get creative to prevent its fraud from being detected. What Southern created were phony or altered documents to

4

"match" the claim.  Several different Southern employees did the false matching, and they did it in two different ways, both at Pate's direction.

The first way involved altering the original documentation.  The employees would, for example, take the physician's actual prescription or order, which bore the physician's signature, white out or physically cut out the portion of the document that didn't match Southern's Brightree billing submission, and replace it with the "correct" (i.e., matching) information.  The second way for covering up the fraud involved old-fashioned, garden-variety forgery.  For example, an employee would forge a physician's signature onto a blank order form and then fill in the equipment details on that form after receiving the Medicare audit request.  If necessary, the employees falsified the delivery tickets in the same two ways.  Where the falsification process yielded two physician's orders or two delivery tickets, Pate or one of her employees shredded the incriminating original document.  And then Pate mailed Medicare the falsified document.

## B.  The Investigation and Indictment

Eventually law enforcement, led by Agent David Graupner of the Department of Health and Human Services, began investigating Southern's billing practices.  During the investigation, Graupner collected Southern's patient files and compared them to its Brightree billing entries.  The comparison showed Southern

was providing patients with the less expensive "K4 wheelchairs" but billing Medicare for the more expensive "K7 wheelchairs."

Using that evidence, federal agents got a warrant and searched Southern's offices. The search uncovered evidence of the matching process Southern used: carbon paper, pieces of documents with a physician's signature or a provider ID number on them, patient forms with information whited or cut out, and blank patient forms "pre-signed" by a physician. The altered documents bore the proported signatures or provider ID numbers of 17 different physicians.

After the search, federal investigators and Pate's lawyers began separately interviewing Southern's employees. One of those employees was Tina Merkerison. Merkerison reported directly to Pate and for most of her time at Southern performed Southern's part of the Medicare audits. At Pate's direction, Merkerison forged documents to make sure that the documents and information that Southern sent to Medicare in response to audits matched Southern's Brightree billing entries. Merkerison had seen other employees do the same. But in interviews with federal investigators and interviews with Pate's lawyers, Merkerison denied that she or any other employee had ever forged, or been instructed by Pate to forge, any documents. Merkerison may have denied it because around the time the investigation began, Pate had told Merkerison and

6

some of Southern's other employees to tell "everybody" that they, and not Pate, had "done everything."

A federal grand jury indicted Pate on one count of conspiracy to commit health care fraud, thirty-six counts of health care fraud, eight counts of aggravated identity theft, and nine counts of money laundering.[1]  The fraud counts alleged that Pate "transfer[red] and disburse[d] . . . hundreds of thousands [of] dollars in proceeds of her fraudulent billing scheme, for her own use and enjoyment and the use and enjoyment of others."

## C.  The Evidence and Trial

The jury heard testimony from Agent Graupner.  He laid out the investigation into Southern's billing practices and the evidence that had been uncovered by the investigation.  He told the jury about an employee named Steve McMillan, who was a delivery technician and Southern's wheelchair guy.  According to Graupner, Southern had obtained a "Medicare wheelchair contract" shortly before McMillan started working there, and he had been hired specifically for his wheelchair expertise.  In his role as Southern's wheelchair expert, McMillan worked mainly on commission but still made more than $400,000 in less than three years.  (Pate's strategy was to lay the blame for the fraudulent billing on

---

[1] The government later dismissed nine of the health care fraud charges and all of the money laundering charges.

7

McMillan.  She argued that it was McMillan who had committed the fraud, not her.)

The jury also heard testimony from Merkerison, who since the initial investigation had changed her story to the detriment of Pate.  She told the jury how Pate had instructed her to make the physician's order, the delivery ticket, and the Brightree billing files match each other whenever Medicare audited Southern.  Merkerison described how, in carrying out Pate's directive, she had kept near her desk a box of materials — Pate called it Merkerison's "arts and crafts box" — that she used to make the necessary alterations and falsifications.  She recounted how she would shred any incriminating documents and create false ones and how Pate would send the false or falsified documents to Medicare in response to the audit inquiries.

Merkerison also testified that she had seen Pate herself forge doctors' signatures on orders, and that Pate had told her the reason they were altering documents was because the other wheelchairs "didn't make enough money." (Medicare paid more for K7 wheelchairs than for the others, K1s and K4s.)  That testimony contradicted statements Merkerison had made to federal investigators and to Pate's own counsel that she'd never seen anyone at Southern falsify documents.  When asked why she'd lied to them earlier, Merkerison explained to

the jury that: "I needed my job, and if I didn't do what I was told to do, I got mistreated."

## D.  The Verdict and Sentence

The jury found Pate guilty of one count of conspiracy to commit health care fraud (Count 1), twenty-four counts of health care fraud (Counts 2–22, 26–28), and eight counts of aggravated identity theft (Counts 29–36).  It found Pate not guilty of three other counts of health care fraud (Counts 23–25).

Pate's presentence investigation report calculated a base offense level of 6 under U.S.S.G. §§ 2X1.1(a) and 2B1.1(a)(2).  Along with some other enhancements, it added two levels under § 2B1.1(b)(10)(C) because the scheme involved "sophisticated means" and another two levels under § 3C1.1 for obstruction of justice.  Pate objected to those two enhancements, but the district court overruled her objections and adopted the PSR's calculations.  With a total offense level of 30 and a criminal history category of I, Pate's guidelines range was 97 to 121 months for the conspiracy and health care fraud offenses along with a mandatory minimum of 24 months for her aggravated identity theft crimes.  The court sentenced her to a total of 121 months.  This appeal followed.

## II.  DISCUSSION

Pate asserts three categories of error.  First she challenges two of the district court's evidentiary rulings, one admitting evidence and one excluding it.  Second

she challenges one statement in one of the court's instructions to the jury at the end of the government's case. And finally she challenges the court's decision to apply two sentencing enhancements.

### A. The Two Evidentiary Rulings

### 1. Admission of Evidence of Exorbitant Spending

In addition to the other evidence that the government presented, which we have summarized already, it also put before the jury evidence that during the three years in which the scheme was operating Pate, as owner of Southern, had written to herself sixteen checks, each on Southern's bank account, totaling $565,000. She had also, among other expenditures, paid with a $23,672.94 check drawn on Southern's account for a new side-by-side utility vehicle as a birthday present for her son, and she had bought a one-carat diamond ring and a Rolex watch with a check drawn on Southern's account for $12,960. She had also paid $14,000 for another diamond, again using a check drawn on Southern's account.

Pate contends the district court abused its discretion in admitting evidence of those large expenditures, which she argues was both irrelevant and unfairly prejudicial. We review only for an abuse of discretion a district court's evidentiary rulings. United States v. Wenxia Man, 891 F.3d 1253, 1264 (11th Cir. 2018). That includes rulings about the relevance of evidence under Federal Rule of

10

Evidence 401 and whether it is unduly prejudicial for Rule 403 purposes.  See

United States v. Bradley, 644 F.3d 1213, 1270–72 (11th Cir. 2011).

"Motive is always relevant in a criminal case, even if it is not an element of

the crime."  United States v. Hill, 643 F.3d 807, 843 (11th Cir. 2011) (alteration

adopted).  But relevant evidence may be excluded under Rule 403 "if its probative

value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R.

Evid. 403.  The risk of unfair prejudice presented by "wealth" evidence is that the

jury might find a defendant guilty simply because she "had lots of money."  See

Bradley, 644 F.3d at 1271.  Balancing the probative value of wealth evidence

against its risk of unfair prejudice is "often difficult" because financial gain is a

motivation for almost all financial crimes.  Id.  But we have said that balance

usually "should be struck in favor of admissibility" because "exclusion under Rule

403 is so drastic a remedy."  See id. at 1272.  This case does not call for that kind

of drastic remedy.

The evidence in question was relevant to show Pate's motive for committing

the fraud, which was making money to finance extravagant purchases for herself

and her family members.  See Hill, 643 F.3d at 843.  And there was little risk of

unfair prejudice, because other trial evidence elicited by Pate's counsel gave the

jury a picture of Pate's relative wealth even apart from the fraudulently acquired

portion of it.  See Bradley, 644 F.3d at 1272.

11

The jury heard testimony that around the time of the fraud Pate had been a vice president of sales at Equifax, as well as owner and CEO of Southern Respiratory, meaning she had in close succession more than one potentially high-paying job.  It heard Pate had been an executive at Equifax for many years, meaning she had held a high-paying job long enough to have potentially amassed significant savings.  And it heard that at the jewelry store where Pate bought a Rolex and diamonds she had been a customer for about twenty-five years, during which time purchases like those weren't out of the ordinary for her.  So the jury had reason to believe that Pate was well to do financially, diminishing any suggestion she had to defraud insurance companies and Medicare in order to buy expensive items.  That doesn't mean the evidence wasn't relevant to show motive, because wealth does not rule out the desire for more wealth.  What it means is that the prejudicial effect of the evidence is lessened.  The district court's decision to strike the evidentiary balance in favor of admissibility was not an abuse of discretion.  See id.

## 2.  The Delta Medical Letter

Merkerison gave damaging testimony against Pate.  See supra at 8–9.  On cross-examination Pate's counsel asked Merkerison about a durable medical equipment company called Delta Medical Equipment, which Merkerison had supposedly created with another of Southern's former employees, Kimberly Grotz.

12

Merkerison's answers to questions about Delta Medical were initially evasive and inconsistent. For example, she said that Delta Medical was nothing more than a "dream" and said it wasn't a company and never went anywhere.

But Delta Medical sent out a letter to doctors who had previously been clients of Southern. The letter, which was written and signed by Grotz, accused Southern of unethical billing practices, informed the doctors that those practices were the reason Grotz left Southern, and solicited the doctors' business. When asked about the letter, which didn't mention her, Merkerison testified that she wasn't aware of its existence until after Grotz sent it to the doctors and that it was effectively Grotz's "resignation letter" to Southern.

Pate's counsel sought to introduce the actual letter, and the government objected, arguing it was hearsay. Pate's counsel didn't explicitly identify the letter's non-hearsay purpose, but he did argue it wasn't being offered for the truth of the matter asserted because Merkerison had "characterized the letter as a resignation letter."

The district court allowed Pate's counsel to read the letter to Merkerison in the presence of the jury. And the court let Pate's counsel cross-examine Merkerison about the letter and about Delta Medical, resulting in nearly forty questions that add up to six pages of trial transcript. All in front of the jury. Pate's counsel also highlighted in closing argument Delta Medical and the letter, and he

hammered home to the jury how both undermined Merkerison's credibility. The only thing Pate's counsel wasn't allowed to do with the letter was have the letter itself admitted into evidence so the jury would have the actual letter during deliberations.

Pate contends that the district court abused its discretion by not allowing the letter itself to be put into evidence. She argues that the contents of the letter were not hearsay because she did not offer it for the truth of any of the statements it contains. Instead, Pate insists, she offered it to show Merkerison's bias and her financial motive to lie about Pate to facilitate her own business venture (a competing medical company). The government counters that the statements in the letter are hearsay because only if those statements are true do they show Merkerison's bias.

We review for an abuse of discretion the district court's decision to exclude the letter. See Wenxia Man, 891 F.3d at 1264. The "abuse of discretion standard allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." In re Rasbury, 24 F.3d 159, 168 (11th Cir. 1994) (quotation marks omitted). "[T]here will be circumstances in which we would affirm the district court whichever way it went." McMahan v. Toto, 256 F.3d 1120, 1129 (11th Cir. 2001), modified in part on other grounds, 311 F.3d 1077 (11th Cir. 2002).

14

Before moving to admit the letter, Pate's counsel extensively — in nearly forty questions totaling six pages of trial transcript — cross-examined Merkerison about Delta Medical and, to a lesser extent, the letter. And after denying the motion to admit the letter, the district court still let Pate's counsel read the letter to Merkerison word-by-word. And the court let Pate's counsel continue to cross-examine her about it. The letter was short, in relevant part only about 50 words, so even without seeing those words on a page in front of it, there is little chance the jury forgot what the letter said. And Pate's attorney reminded them of it during closing argument. Given all of the circumstances, we cannot say that the district court abused its discretion in not admitting the letter itself into evidence. See In re Rasbury, 24 F.3d at 168; see also McMahan, 256 F.3d at 1129.

Pate also argues that not admitting the physical letter into evidence violated the Sixth Amendment's Confrontation Clause. We would normally review de novo whether it did. See United States v. Gari, 572 F.3d 1352, 1361 (11th Cir. 2009). But where there was no Confrontation Clause objection at trial, we review only for plain error. United States v. Jiminez, 564 F.3d 1280, 1286 (11th Cir. 2009). The standard of review doesn't matter because there was no violation regardless. Pate hasn't identified a testimonial statement that Merkerison made, which is required to sustain a Confrontation Clause challenge. See United States v. Cooper, 926 F.3d 718, 731 (11th Cir. 2019) (noting that statements that "were not

15

testimonial . . . did not implicate the Confrontation Clause").  Not only that, but her

counsel was allowed to cross-examine Merkerison about the letter.

### B.  One of the Jury Instructions

After the government rested its case, the district court instructed the jury:

> Ladies and gentlemen of the jury, the Government has rested its case in chief.  What remains now which we will take up in the morning, in every criminal case — remember I explained to you at the beginning of the trial that the Government has the burden of proof.  The defendant does not have the burden of proof.  So in every criminal trial it is the defendant's decision whether or not to put forth a defense, and so in the morning we will find out from the defense what witnesses or evidence they wish to put forth, if any.  And they're not required to.  Remember that.  That is their choice since the Government has the burden of proof.  Nevertheless, in the morning we will hear from the Defendant — from the defense, again, if they make the decision to put forth any evidence or any witnesses of any kind.

Pate did not object to that instruction.  She ultimately declined to present any

testimony, including her own, thereby exercising her Fifth Amendment right to

remain silent.

Pate now contends that the district court erred in making the following

statement in that instruction:  "[I]n the morning we will hear from the Defendant

— from the defense, again, if they make the decision to put forth any evidence or

any witnesses of any kind."  She argues the court's statement violated her Fifth

Amendment right to silence.  We review only for plain error jury instructions

challenged for the first time on appeal.  United States v. Felts, 579 F.3d 1341, 1343

(11th Cir. 2009).

16

To protect an accused's right to silence, the Fifth Amendment forbids suggesting to the jury that a defendant's silence is substantive evidence of her guilt. United States v. Thompson, 422 F.3d 1285, 1299 (11th Cir. 2005) (citing United States v. Robinson, 485 U.S. 25, 31–33 (1988)). To determine whether such a suggestion has been made, we look to whether either of the following is true: (1) the comment was "manifestly intended" to invite the impermissible inference of guilt; or (2) the nature of the comment was such that a jury would "naturally and necessarily" construe it as an invitation to make an inference of guilt based on the defendant's silence. Id.

The district court's statement here bears neither offending hallmark. First, Pate herself believes, or at least presumes, that the district court's statement about "hear[ing] from the Defendant" was "a slip of the tongue," as do we. The context and the words immediately following those show it was obviously unintended. And an unintentional slip up is the opposite of manifest intent.

Nor is there is anything to suggest the jury would have "naturally and necessarily" taken the court's statement as an invitation to infer Pate was guilty because she failed to testify. It wouldn't have for a number of reasons. For one thing, the statement doesn't say that the jury should do that. For another, the four words ("hear from the Defendant") appear in the middle of one sentence of a 147-word paragraph in which the court reiterates on four occasions that Pate doesn't

17

have to put forward a defense and on two occasions that the government has the burden of proof. To conclude the court's statement violated Pate's Fifth Amendment rights, we would have to assume the jury disregarded repeated instructions that Pate wasn't required to defend herself and that the government had to prove her guilt no matter what, if anything, she offered in response. We don't presume that juries ignore their explicit instructions, but just the opposite. See United States v. Almanzar, 634 F.3d 1214, 1223 (11th Cir. 2011).

The district court's comments were not error, plain or otherwise.

## C.  Sentencing Issues

Finally, Pate contends the district court erred when calculating her guidelines range by applying two different two-level enhancements, one for using sophisticated means and one for obstruction of justice.

"With respect to Sentencing Guidelines issues," we review "purely legal questions de novo, a district court's factual findings for clear error, and, in most cases, a district court's application of the guidelines to the facts with due deference." United States v. Rothenberg, 610 F.3d 621, 624 (11th Cir. 2010) (quotation marks omitted).

### 1.  Sophisticated Means

Pate argues the district court should not have imposed the sophisticated means enhancement because a substantial part of the fraud involved the use of

18

rudimentary materials.  In her view, that enhancement applies to "exceptional

fraudsters," not to the "common everyday fraudster."  She views the crimes for

which she was convicted as common everyday fraud because they involved

"garden variety false claims submitted to Medicare" and a coverup achieved by

"archaic" means.

That argument fails for two reasons.  The first is that Pate conflates modern

with sophisticated and "old-school" with simple, a view unsupported by our

precedent.  See, e.g., United States v. Moran, 778 F.3d 942, 977 (11th Cir. 2015)

(concluding the district court did not err in applying the sophisticated means

enhancement to a scheme involving "the widespread use of kickbacks, the

falsification of group therapy notes, and the laundering of proceeds from the

fraud").

The second is that, even if some parts of it were simple, the district court did

not clearly err in finding that Pate's scheme as a whole qualifies as sophisticated.

See United States v. Barrington, 648 F.3d 1178, 1199 (11th Cir. 2011).  "In

evaluating whether a defendant qualifies for the enhancement, the proper focus is

on the offense conduct as a whole, not on each individual step."  United States v.

Bane, 720 F.3d 818, 826 (11th Cir. 2013).  A district court may find that the

sophisticated means enhancement applies when the offense "involved repetitive,

coordinated conduct designed to allow [the defendant] to execute [the] fraud and

19

evade detection." Id. at 827. Pate used a software system to commit the fraud; instructed employees to manipulate an intricate paper trail to commit and cover up the fraud; instructed employees to falsify medical documents, including forging doctors' signatures; forged doctors' signatures herself; and instructed employees to destroy some documents to cover up the crimes.

The fraud, including the concealment, lasted at least three years and involved multiple participants. See id. at 826–27. They forged several doctors' signatures. The crimes inflicted substantial loss. See United States v. Feaster, 798 F.3d 1374, 1381 (11th Cir. 2015) ("[T]he length of the scheme and the loss inflicted by it . . . can be acceptable factors to evaluate in determining whether the totality of the scheme employed sophisticated means."). The fraud "involved repetitive, coordinated conduct." See Bane, 720 F.3d at 827. The district court did not clearly err in imposing the sophisticated means enhancement. See Barrington, 648 F.3d at 1199.

## 2. Obstruction of Justice

Pate also argues the district court erred in imposing the obstruction of justice enhancement because, in her view, the only evidence supporting it was Merkerison's testimony that Pate instructed Merkerison to lie to a lawyer in the firm representing Pate. She is incorrect about that.

A two-level obstruction of justice enhancement applies when "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and that obstruction relates to "the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. "Obstructive conduct can vary widely" and includes "threatening, intimidating, or otherwise unlawfully influencing" a witness or "suborning, or attempting to suborn[,] perjury." Id. cmt. nn.3, 4(A), (B). The commentary doesn't define "unlawful influence," but we've held that it includes urging a potential witness to lie to the police. United States v. Amedeo, 370 F.3d 1305, 1318–19 (11th Cir. 2004). Pate did that in this case.

Merkerison testified that Pate told her and others at Southern "to tell everybody that we done [sic] everything." The district court (and it appears the jury) interpreted that statement to mean Pate told Merkerison to lie about what happened at Southern. Pate doesn't outright disclaim that interpretation, but she quibbles with it. She essentially admits she told Merkerison and other Southern employees to lie, but she urges us to interpret the testimony to mean she told them to lie only to Pate's own lawyers during their investigation of the case. But common sense, and the rest of Merkerison's testimony, belies that interpretation. Maybe Pate feared her lawyers learning the truth, but she couldn't have been more

21

concerned about that than she would have been about law enforcement learning the truth. That point is confirmed by Merkerison's clarification on re-direct that "everybody" included federal investigators.

Merkerison's testimony also described an earlier interview with federal agents in which she had told them she "had never seen any documents being falsified." That was untrue. When asked why she'd lied in the earlier interview, she said, "I needed my job, and if I didn't do what I was told to do, I got mistreated." That statement further supports a conclusion that what Merkerison was "told to do" was lie to federal investigators. The district court did not err in finding Pate obstructed justice.

## III.

Because the district court did not err while conducting Pate's trial or in sentencing her, we affirm.

**AFFIRMED.**