[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 19-11972 & 19-13019

_____

D.C. Docket No. 9:18-cr-80053-RLR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALSTON ORLANDO LEROY WILLIAMS,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(July 23, 2021)

Before MARTIN, GRANT, and BRASHER, Circuit Judges.

GRANT, Circuit Judge:

For over a decade, Alston Williams used a grotesque combination of physical abuse and emotional manipulation to force vulnerable young women to work for him as prostitutes. He was eventually charged and convicted of sex trafficking three women—two of whom were minors when he recruited them. The

district court sentenced him to more than five terms of life imprisonment and ordered that he pay restitution to his victims, returning the years of their prostitution earnings that he pocketed. Williams now appeals his convictions and his sentence. Because we find that the convictions for his horrific crimes were supported, the restitution was both correctly calculated and lawfully imposed, and the sentence was reasonable, we affirm.

I.

Deborah was 16 years old when she first met Alston Williams.[1] She had dropped out of high school and was pursuing her GED; she lived with her father, but her home life was complicated. That's when a friend, Marilyn, reached out over MySpace and confided, "I think I can make your life a lot better."

At first, Deborah didn't know what that meant. When she met up with Marilyn and Williams, Marilyn told her that she worked at a hotel, which Deborah assumed meant that she worked as a cleaning lady or at the front desk. A few weeks later, Marilyn clarified that she went on dates for money and asked Deborah to accompany her. Williams started regularly driving her to the hotel to spend the night with Marilyn. Only then did Deborah discover Marilyn's real occupation: men paid for sex, not companionship.

During those visits, Deborah sat in the bathroom or outside, watching the men come in and out of the hotel room. At the end of the night, she saw Marilyn give Williams all the money she had earned, for his "safekeeping." He assured

---

[1] The victims' names have been changed to preserve their privacy. In the superseding indictment, Deborah is Victim 1, Raquel is Victim 2, Gini is Victim 3, and Deja is Victim 6.

Deborah that the three of them were "all a family"—it was "all our money, and he would just hold on to it."

For a while, Deborah just watched and observed. But one night, a man who had come for Marilyn caught a glimpse of Deborah in the lobby. He wanted her instead. Hearing that, Williams pressed her to go upstairs with the man. Do it "for the family," Williams coaxed. "[J]ust go up there, spend time with him," and if "he wants to do something, just do it and get it over with." After being pressured by Williams for a half hour, Deborah relented. Marilyn handed her a condom and Deborah went up to the hotel room and did a "sexual favor" for the buyer. At Williams's direction, she charged him somewhere between $100–$200, which she promptly handed to Williams when she returned downstairs. Though she told him that she didn't like what she just did, he brushed her off.

Deborah did not want to continue to prostitute, but she felt trapped. She finally had people in her life—Williams and Marilyn—and she "wanted to keep them in [her] life" and "make them happy." Williams, she thought, was her boyfriend and she believed, at least at first, that she loved him. What she didn't realize at the time was that this was a frequent tactic of sex traffickers; a "Romeo trafficker" encourages his victims to become emotionally dependent on him and to cultivate loyalty to his "family" of girls so that he can manipulate them into getting involved in prostitution. So when Williams asked her—if it could be called "asking"—to start soliciting buyers for sex, she agreed and began going on calls once or twice a week. She had just turned 17.

3

Around that time, Williams forced another 17-year-old girl named Deja into his prostitution ring. Williams, Marilyn, and Deborah came across her sitting on the street in "a bad area" of town. Williams mentioned that she was pretty and asked Marilyn and Deborah to go talk to her. At the time, Deja was "in a bad place" and came from a broken home, so it took little convincing before she agreed to come with Marilyn and Deborah, and move into Williams's home. Once there, she began prostituting almost immediately and turned all her earnings over to Williams. Williams targeted and recruited other vulnerable girls this way over the next several years, eventually adding Raquel (age 18) and Gini (age 17) into his "family."

On her 18th birthday, Deborah moved in with Williams and life took on a new rhythm. She began seeing sex buyers nearly every day. She met some at hotels after they booked her directly through her online ads; she saw others through shifts at an escort agency or at brothels. But no matter where she was working or for how long, two things remained constant. First, she checked in with Williams on a phone that he gave her as she saw buyer after buyer—updating him when the buyer arrived, when he paid, and when he left. And second, she would surrender everything that she earned to Williams.

Once Deborah moved in with Williams, it didn't take long for him to show his true colors. He took her ID, birth certificate, and social security card, and started constantly monitoring her and the other girls through security cameras placed throughout his house. Violence soon became the norm if Deborah or the other girls failed to communicate, didn't bring home enough money, or were seen

4

as disloyal.  At times, Williams would lash out without warning—lunging at a girl and choking her until she passed out or dragging her down the stairs and around the house by her hair.  Other times, his violence was more deliberate.  He would warn the girls about what was coming, go to the stereo and turn up the music so no one could hear their screams, and then brutally beat the offending girl—sometimes alone, sometimes in front of the others.  The punishments varied.  He tased, punched, slapped, and kicked the girls—sometimes with their arms handcuffed behind their backs so that they couldn't defend themselves.  He kept a pair of pliers to clamp down on their fingers and hands, occasionally dragging them with the pliers around the house.  He groped their private areas until they bled and stabbed sewing needles into their knees and buttocks, or under their fingernails.  He partially drowned Raquel and struck Deborah with his car (he said he was just "playing").

Williams also tormented the girls with threats.  Indeed, he often threatened to kill the girls or their families if they didn't obey him.  He told one girl that if he wanted to kill her, he would "dump [her] body into the Everglades, that way the gators can have [her] . . . and that peroxide would clean up the blood and no one would find [her]."  He once held a shotgun to Gini's leg and pulled the trigger, though it apparently was not loaded.  On another occasion, he grabbed Deja, shoved her into the trunk of his car, and drove around for about an hour, threatening to "get rid of her."

Not even pregnancy could save the girls from Williams's beatings or his sexual demands.  When Deja became pregnant, he beat her and then directed

5

Marilyn to punch her in the stomach and stomp on her.  He made Gini get an

abortion and then forced her to have sex with him four days later.  Deborah also

became pregnant—once when she was 18 and a second time a year or two later.

Each time, Williams forced her to have an abortion.

This is how Williams treated his "family" for more than a decade.

Eventually, one of the girls tipped off law enforcement, and Williams was arrested

and charged with two counts of sex trafficking a minor, seven counts of sex

trafficking an adult, one count of forced labor, and one count of obstructing a

human trafficking investigation.  The jury found Williams guilty of trafficking

Deborah and Deja as minors and of trafficking Deborah, Deja, and Gini as adults,

all under 18 U.S.C. § 1591(a)(1).  He was also convicted of obstructing a human

trafficking investigation under 18 U.S.C. § 1591(d).  The jury acquitted him of the

additional counts of trafficking three other women, including Raquel.  He was

sentenced to life imprisonment and ordered to pay restitution to Deborah, Deja,

and Gini.  Williams now appeals his convictions and his sentence.

## II.

Williams challenges his convictions on three grounds.  *First*, he contends

that the district court improperly admitted nude images and videos of the girls.

*Second*, he insists that there was not enough evidence to show that he had the

required mens rea for his crimes against Deja.  And *third*, he argues that the district

court should have instructed the jury that a victim's consent to perform a sex act is

a defense to sex trafficking.  We address each argument in turn.

A.

Predictably, much of the evidence presented at Williams's trial was graphic. The women who testified described their work as prostitutes—including specific encounters with various sex buyers—and detailed Williams's violent punishments. During their testimony, the government introduced images of the girls—sometimes nude, sometimes in lingerie—that were posted as online ads. But there were also other images and videos that Williams kept, including nude pictures of the girls in sexually provocative poses showing their genitals, and videos of the girls engaging in sexual conduct with Williams and each other at his direction. The defense objected at trial that admission of these files went too far.

Williams conceded the relevancy of the evidence. To convict Williams of sex trafficking Deborah, Deja, and Gini as adults, the government needed to prove that he knew or recklessly disregarded the fact that "means of force, threats of force, fraud, [or] coercion" would be used "to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a). And, as the government explained, the images demonstrated coercion by showing how "Williams dominated and degraded his victims by forcing them to engage in sexual conduct and keeping evidence of that behavior to use however he pleased." But the probative value of this evidence, Williams said, was substantially outweighed by the danger of unfair prejudice, especially without the court blurring or blacking out the "particularly lurid" parts of the images. The district court disagreed and admitted the files.

Because Williams agreed that this evidence was relevant under Federal Rule of Evidence 401, the only question on appeal is whether its probative value was

7

substantially outweighed by the danger of unfair prejudice.  Fed. R. Evid. 403.  We review the decision to admit the files for abuse of discretion, viewing the evidence in the light "most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact."  *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006) (quotation omitted).

We agree that the images and videos were probative.  To prove charges under § 1591(a), the government needed to show that Williams knew means of force, threats of force, fraud, or coercion would be used to cause his victims to engage in commercial sex.  These images and videos helped to show how Williams exerted complete dominance over his victims.  Several videos show Williams directing the girls to engage in sexual conduct while he watched and recorded— one even showed a weapon in view of the camera.  And the images show how he took sexually explicit photos of the girls, having them pose in provocative positions so he could photograph their genitals and naked bodies.  The videos and images also corroborated the victims' testimony that Williams forced them to engage in sexual acts.

The challenged evidence was also not unduly prejudicial.  To be sure, these images and videos are graphic.  But it is unsurprising, given the nature of the crime itself, that explicit evidence would need to be introduced.  *See id.* at 1296.  And to minimize the prejudicial impact of this evidence, the district court cautioned potential jurors during voir dire that they would hear testimony and view evidence of a "sexually explicit nature."  The jurors confirmed that this would not impact their ability to be fair and impartial.  We have explained, in a case involving child

8

pornography, that screening jurors in this way diminishes the potential for undue prejudice from sexually explicit images. *See United States v. Dodds*, 347 F.3d 893, 899 (11th Cir. 2003). Because the district court mitigated the prejudicial effects of the evidence—even if not to the extent requested by the defense—by screening potential jurors, we find no abuse of discretion in admitting these files. The government does not need to be deprived of its "most probative evidence" simply because it is emotionally charged. *Smith*, 459 F.3d at 1296.

## B.

Williams next argues that the government failed to present sufficient evidence that he knowingly trafficked Deja as a minor and as an adult. We consider de novo whether the evidence was sufficient to sustain a criminal conviction, viewing the facts and drawing all reasonable inferences in the light most favorable to the government. *United States v. Davis*, 854 F.3d 1276, 1292 (11th Cir. 2017). Williams makes two arguments: *first*, that there was no evidence Deja told him that she was underage, and *second*, that because Deja never testified, there was no way to know whether as an adult she was coerced to engage in commercial sex or if she did so willingly. Neither is persuasive.

Under the version of § 1591 in effect at the time Williams trafficked Deja as a minor, he could be convicted only if he knew that she "ha[d] not attained the age of 18 years and [would] be caused to engage in a commercial sex act."[2] 18 U.S.C.

---

[2] In 2008, Congress amended this mens rea requirement. *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 222, 122 Stat. 5044, 5069. A defendant can now be convicted of sex trafficking a minor if he knows *or recklessly disregards* the fact that the victim is not yet 18 years old. *Id.* The amendment also removed the

§ 1591(a) (2006).  Here Deborah testified that Deja told Williams that she was 17 years old when he put her to work as a prostitute.  And when considering the sufficiency of the evidence, we must draw "all reasonable inferences and credibility choices in the government's favor."  *United States v. Flores*, 572 F.3d 1254, 1262 (11th Cir. 2009).  We thus assume that the jury found this testimony credible.

But even if it didn't, the government presented other evidence that strongly suggested that Williams knew Deja's age.  He took her ID documents when she moved in with him; those documents showed Deja's date of birth.  Officers found multiple copies of these documents inside his locked safe after he was arrested.  So between Deborah's testimony and the recovered IDs, there was ample evidence supporting the jury's finding that Williams knew that Deja was a minor.

And though Deja never testified, the government presented plenty of evidence showing that while she was an adult, Williams used "means of force, threats of force, fraud, [or] coercion" to cause Deja to "engage in a commercial sex act."  18 U.S.C. § 1591(a).  Coercion is defined in the statute as "threats of serious harm to or physical restraint against any person" and "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person."  *Id.* § 1591(e)(2).  This record is full of testimony about the "threats of serious harm" and actual force used against Deja to cause her to work as a prostitute.

---

government's burden of proving the defendant's mens rea if the "defendant had a reasonable opportunity to observe" the victim.  *Id.*

Indeed, Williams abused all the girls, but he was particularly aggressive toward Deja. On one occasion, he "held her down and hit her in the face multiple times" with a pair of shoes. He "hit her in the head with a water bottle" and "put the pliers on her, too." Once, when she was "being bad," Williams "tied her up with rope, put her in the trunk of the car," and drove around for an hour saying he was "going to get rid of her." Another time, when Deja became pregnant, he had Marilyn "punch her in the stomach and stomp on her." And even when Williams wasn't beating Deja, he made sure that she and the other girls watched when he was brutalizing another one of them so "they would learn."

Deborah explained that Williams's beatings made her "terrified of him" and that although she never wanted to work as a prostitute, she did it to "make him happy." Doing sex acts for buyers meant bringing in money, and the more money that the girls brought in, the fewer beatings there were. So though Deja never testified to what effect the beatings and threats had on her willingness to prostitute, we are convinced that there was significant evidence that Williams knew that "force, threats of force, fraud, [or] coercion" would "be used to cause" Deja to "engage in a commercial sex act."[3] *Id.* § 1591(a).

## C.

Williams's final objection to his trial involves the jury instructions. He argues that the district court erred by refusing to give an instruction that "consent

---

[3] To the extent that Williams argues that the jury's acquittals for other counts of adult sex trafficking show that the jury did not view his violent behavior as threatening or coercive, a "jury's verdicts are insulated from review on the ground that they are inconsistent, as long as sufficient evidence supports each finding of guilt." *United States v. Albury*, 782 F.3d 1285, 1295 (11th Cir. 2015) (alteration adopted) (quotation omitted).

or voluntary participation of an adult is a defense" to sex trafficking, "because an adult can legally consent to commercial sex." We review this decision for abuse of discretion. *United States v. Rutgerson*, 822 F.3d 1223, 1236 (11th Cir. 2016). Refusal to give a requested jury instruction is reversible error only if "(1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself." *United States v. Jordan*, 582 F.3d 1239, 1247–48 (11th Cir. 2009) (quotation omitted). We reverse only if we are left with a substantial and ineradicable doubt "as to whether the jury was properly guided in its deliberations." *Rutgerson*, 822 F.3d at 1236 (quotation omitted).

That standard forecloses Williams's argument. Our Circuit has never recognized consent as a valid defense to sex trafficking, nor does Williams cite any other circuit that has. But even if consent were a valid defense, the court's jury instructions "substantially covered" this issue. *Jordan*, 582 F.3d at 1247 (quotation omitted). The instructions that the court gave explained that Williams was guilty only if he knew that "means of force, threats of force, fraud, coercion, or any combination of such means would be used to cause the person to engage in a commercial sex act." The jury did not need a separate instruction, then, to explain that if the victim willingly chose to engage in a commercial sex act, force or coercion did not *cause* her to do it. *See Rutgerson*, 822 F.3d at 1236 (an instruction that tracks the statute's text will almost always be an accurate statement

12

of the law). So even if Williams is correct that the defense of consent is implied in the statute, we find no abuse of discretion in rejecting his proposed instruction.

### III.

Williams believes that the district court's alleged errors extended to his sentencing as well. The court sentenced him to five terms of life imprisonment and 240 months' imprisonment (all to run concurrently) and ordered him to pay restitution. He insists that the district court improperly calculated and awarded restitution to his victims. He also claims that his sentence was substantively unreasonable. But as with his challenges to his convictions, we are unpersuaded.

### A.

The Trafficking Victims Protection Act dictates when and how restitution should be provided to victims of sex trafficking. According to that statute, the "court shall order restitution for any offense under this chapter" for the "full amount of the victim's losses, as determined by the court." 18 U.S.C. § 1593(a), (b)(1). The district court, relying on that language, held that it "must award restitution" to Williams's victims and ordered him to pay $522,600 to Deborah, $30,000 to Gini, and $221,000 to Deja.

Williams advances three arguments for why this order was unlawful. First, he suggests that because the government estimated the restitution award, rather than producing precise records to establish the exact amount, it did not prove the amount by a preponderance of the evidence. Next, he argues that the victims' living expenses should have offset at least part of the restitution amount. Finally, he claims that he does not need to pay Deja's restitution because she renounced the

13

payment.  In considering these arguments, we review the factual findings underlying the restitution order for clear error, the procedures used at the restitution hearing for abuse of discretion, and the legality of the restitution order de novo.  *United States v. Baston*, 818 F.3d 651, 660 (11th Cir. 2016).

To begin, the court did not abuse its discretion in calculating the amount of restitution.  The government bears the burden of proving the amount of the victims' losses by a preponderance of the evidence.  *See* 18 U.S.C. § 3664(e); *see also United States v. Futrell*, 209 F.3d 1286, 1290 (11th Cir. 2000).  Williams claims that the government failed to meet that burden here because it merely estimated how much Deborah, Gini, and Deja earned as prostitutes.  But such estimates are permitted, so long as "the basis for reasonable approximation is at hand."  *Futrell*, 209 F.3d at 1292 (quotation omitted).  We understand that "criminals rarely keep detailed records of their lawless dealings, totaling up every column and accounting for every misbegotten dollar."  *Id.* (quotation omitted).  Poor recordkeeping cannot foreclose restitution.  So a district court may rely on credible evidence, including trial testimony, that provides a reasonable and reliable estimate of the victims' losses.

The court did just that here.  Relying on trial testimony, it multiplied each victim's estimated average daily earnings by the number of days she prostituted.  The court then reduced the calculation of Deborah's and Deja's awards (which were far more substantial than Gini's) by a considerable percentage to ensure a conservative estimate.  This method has been used to calculate restitution in other sex trafficking cases, and we think it is sufficiently reliable to provide a

14

"reasonable estimate" for Deborah, Gini, and Deja's prostitution earnings. *See id.*; *see also Baston*, 818 F.3d at 665.

Next, the court was not required—or even permitted—to offset the restitution it ordered by the amount Williams expended on his victims' living expenses. Restitution is generally "not intended to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *United States v. Bane*, 720 F.3d 818, 827 (11th Cir. 2013) (quotation omitted). So, under some restitution schemes, when victims receive a benefit from the defendant—even if they ultimately end up with a loss—the restitution award must be offset by the value of that benefit. *See id.* Williams thinks a similar principle should apply here. For years, he confiscated his victims' prostitution earnings. But he claims he used some of that income for their benefit—providing them with food, housing, and clothing. To allow them to recoup the full amount of their prostitution earnings *without* deducting their living expenses, he says, results in a windfall.[4]

That argument is at odds with the restitution scheme Congress enacted for trafficking victims. The TVPA says that an "order of restitution under this section shall direct the defendant to pay the victim (through the appropriate court

---

[4] Williams claims that our Court has endorsed this practice in a similar sex trafficking case. Not so. In *United States v. Baston*, another TVPA case, we noted that the district court subtracted the victims' living expenses from its approximation of their earnings, but we did not consider whether that was proper because the parties did not contest that aspect of the calculation on appeal. *See* 818 F.3d at 665; *see also Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (quotation omitted)).

15

mechanism) the full amount of the victim's losses, as determined by the court under paragraph (3) of this subsection."  18 U.S.C. § 1593(b)(1).  Paragraph (3) goes on to explain that "the term 'full amount of the victim's losses' has the same meaning as provided in section 2259(c)(2)," which allows victims of child pornography to recover costs of medical services, therapy, and temporary housing, among other things.  *Id.* § 1593(b)(3); *id.* § 2259(c)(2).  The TVPA adds, though, that trafficking victims "shall in addition" recover "the greater of the *gross income or value* to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act."  *Id.* § 1593(b)(3) (emphasis added).

The key word is "gross"—that is, "gross income or value."  Webster's Third New International Dictionary defines "gross" as "an overall total exclusive of deductions (as taxes, expenses)," and Black's Law Dictionary defines "gross income" as "[t]otal income from all sources *before* deductions, exemptions, or other tax reductions."  Webster's Third New International Dictionary 1002 (3d ed. 1993); Black's Law Dictionary 710, 767 (7th ed. 1999) (emphasis added).  So by emphasizing that the victim is entitled to the "gross income" derived from her trafficking, the text is clear: she is entitled to the full amount, without any offset.  Because the district court here awarded restitution based solely on the victims' earnings, we affirm the district court's award.

The TVPA's text also cuts against Williams's third and final argument against the restitution order.  The district court awarded Deja $221,000 in restitution.  But Deja, Williams's attorney claimed, did not want his money.  She

16

had told an investigator for the federal public defender's office that she "didn't want to go forward with any restitution." Though the government disputed that Deja renounced her award, the district court held that even assuming Deja did not want it, "the Court must award restitution." Restitution under the TVPA, it said, is mandatory.

We agree. Indeed, the TVPA leaves little ambiguity on this point. Under the heading "Mandatory restitution," the statute instructs that "the court *shall* order restitution for any offense under this chapter." 18 U.S.C. § 1593(a) (emphasis added). Of course, depending on the context, "shall" does not always impose an obligation. But "when the word *shall* can reasonably be read as mandatory, it ought to be so read." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 114 (2012). And here, nothing in the statute suggests that "shall" should be read as anything other than "must."

Williams instead reads the TVPA to require restitution only if the victim wants to receive it. This conclusion, he says, follows naturally from the text of the TVPA and the statute implementing TVPA restitution orders, 18 U.S.C. § 3664. The TVPA, as we have already explained, says that the "court shall order restitution"—but it also requires that the order of restitution "direct the defendant to pay *the victim*." 18 U.S.C. § 1593(a), (b)(1) (emphasis added). Victims, however, are not "required to participate in any phase of a restitution order." *Id.* § 3664(g)(1). And, if "at any time" a victim chooses not to receive payments, she may assign her "interest in restitution payments to the Crime Victims Fund in the

17

Treasury without in any way impairing the obligation of the defendant to make such payments." *Id.* § 3664(g)(2).

Williams latches onto § 3664(g), claiming that its provisions create an opt-out clause, so that a victim can effectively choose for her trafficker not to face a restitution order. After all, he says, victims can choose not to "participate in any phase of a restitution order," which means they can decide not to accept payments. *Id.* § 3664(g)(1). And this, the argument goes, opens the door for restitution to *not* be mandatory. Why? Because the TVPA says that the restitution order must "direct the defendant to pay *the victim*." *Id.* § 1591(b)(1) (emphasis added). So if the victim refuses payment, then the court cannot require restitution—at least according to Williams.

As he points out, the Tenth Circuit adopted this reasoning when construing another restitution statute—the Mandatory Victims Restitution Act—with very similar language to the TVPA. *See United States v. Speakman*, 594 F.3d 1165, 1175 (10th Cir. 2010). There, rejecting the district court's concern that it would "allow the victim to trump the mandatory nature of the statute," the Tenth Circuit found that restitution was not required under the MVRA when the victim explicitly disclaimed payments without assigning her interest. *See id*. (alterations adopted) (quotation omitted). *But see United States v. Hankins*, 858 F.3d 1273, 1278–80 (9th Cir. 2017) (the MVRA's restitution obligation is a "mandatory" and "continuous" one "that does not ebb and flow with the victim's circumstances").

But this argument is inconsistent with our own precedent and with the TVPA's mandatory language. *First,* although we have not considered whether a

18

victim can disclaim restitution payments, we (unlike the Tenth Circuit) have already said that "the MVRA not only allows, but requires, the district court to order restitution." *In re Wellcare Health Plans, Inc.*, 754 F.3d 1234, 1238 (11th Cir. 2014). And we have emphasized—many times—that restitution under the MVRA is "mandatory." *United States v. Puentes*, 803 F.3d 597, 606 (11th Cir. 2015); *see also United States v. Collins*, 854 F.3d 1324, 1329 (11th Cir. 2017). So whatever § 3664(g)'s "opt-out" provisions mean, they must be read consistent with that mandatory obligation.

And *second*, the plain meaning of the TVPA's phrase that "the court *shall* order restitution" is that the court *must* order restitution. *See* Scalia & Garner, *Reading Law* at 114. Section 3664(g) does not contradict that. Instead, by saying that a victim shall not be required to "participate in any phase of a restitution order," the statute simply allows the court to order restitution whether or not the victim participates in the other portions of the restitution proceedings—such as testifying, producing evidence, or speaking with government attorneys. *See* 18 U.S.C. § 3664(d)(1), (2), (4).

Indeed, the statute itself recognizes that sometimes restitution will not be paid directly to the victims: "A victim may at any time assign the victim's interest in restitution payments to the Crime Victims Fund in the Treasury without in any way impairing the obligation of the defendant to make such payments." *Id.* § 3664(g)(2). So an insistence that the court cannot order restitution unless it is paid directly to the victim is inconsistent with the overall structure and context of the TVPA. Though these two provisions provide ways that victims may avoid

19

participating in restitution proceedings, or receiving restitution payments, neither one eliminates the mandatory language of the TVPA.

So here, the court was required to order Williams to pay restitution to Deja. If she wishes, she can "at any time" assign her "interest in restitution payments to the Crime Victims Fund in the Treasury without in any way impairing the obligation of the defendant to make such payments." *Id.* But even if Deja declines to accept her share of the restitution payment, Williams cannot keep her prostitution earnings for himself.

### B.

We turn finally to the substantive reasonableness of Williams's sentence. We review the substantive reasonableness of a sentence for abuse of discretion and will vacate the sentence only if we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (quotation omitted). The party challenging the sentence bears the burden of establishing that it is unreasonable. *United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010).

Williams does not come close. Though he was convicted of sex trafficking three young women—after years of brutally torturing, beating, and threatening them into submission—he now tries to minimize his crimes, saying that the 15-year mandatory minimum should have been more than enough because he "did not murder anyone or inflict life threatening bodily injury." He urges that the "sex

20

trafficking guidelines are structurally flawed and produce an inflated and exaggerated sentencing range" which results in a life sentence for most sex traffickers rather than allowing for "individualized sentencing based upon true relevant conduct." Whether or not that contention is true, this is far from the right case to prove the point.

After considering the sentence recommended by the Guidelines, the court here was required to consider—and indeed, did consider—the factors under § 3553(a) to ensure that Williams's sentence was "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. *Irey*, 612 F.3d at 1196 (quoting 18 U.S.C. § 3553(a)). These factors include individualized considerations such as the "nature and circumstances" of Williams's offenses, as well as his own "history and characteristics." *See, e.g.*, 18 U.S.C. § 3553(a)(1).

The court, in explaining Williams's sentence, said that it considered his family ties, education, and history of employment, as well as his minimal formal criminal record (scoring a criminal history category of I). But it did not escape the court's attention that Williams had a record—including "aggravated battery of a pregnant woman, false imprisonment, misdemeanor battery, violation of a restraining order, living on the earnings of prostitution, disorderly conduct and various traffic/licensing infractions." Nor did the horrendous nature and circumstances of Williams's crimes evade the district court's notice: the court observed that he "subjected his victims to heinous acts of physical abuse, psychological control, and forced prostitution for many years," leaving them to live "in terror, victimized and brutalized." And, it added, there were serious concerns

21

that Williams would be likely to recidivate.  Though he was 42 years old, he had "almost no employment history" and his "experience in providing for himself is in trafficking young women."

The district court's extensive colloquy shows that it considered Williams as an individual; in fact, that individual consideration turned out not to be to his advantage.  Williams, in turn, makes no argument that the court failed to afford consideration to relevant factors that were due significant weight, gave significant weight to an improper or irrelevant factor, or committed a "clear error of judgment in considering the proper factors." *Irey*, 612 F.3d at 1189 (quotation omitted).  We find no abuse of discretion in the imposed sentence.

* * *

We **AFFIRM** Williams's convictions and his sentence, including the order of restitution.

22